2020 UT App 145

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ASHTEN NUNES,
Appellant.

Amended Opinion[*]
No. 20161070-CA
Filed October 22, 2020

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 151903010

Freyja R. Johnson, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE DIANA HAGEN concurred.
JUDGE GREGORY K. ORME dissented, with opinion.

CHRISTIANSEN FORSTER, Judge:

¶1　Appellant Ashten Nunes challenges his conviction for rape, contending that his trial counsel (Trial Counsel) provided ineffective assistance. We affirm.

---

[*] This Amended Opinion replaces the Opinion in Case No. 20161070-CA issued on April 30, 2020. After our opinion issued, the Appellant filed a petition for rehearing, and we called for a response. We grant the petition for the purpose of clarifying the analysis in paragraphs 24 to 33 of the Amended Opinion, which necessitated corresponding changes to the dissenting opinion.

BACKGROUND[1]

¶2   In September 2013, Nunes, then seventeen, met a fourteen-year-old girl (Victim) at a concert. Victim and Nunes soon began communicating through text messages and a variety of social media platforms. Victim felt she could relate to Nunes because they both had "a troubled home life" and "a hard upbringing." Victim was also "intrigued" by Nunes "because he was into things like magic and crystals." Their electronic communication soon turned sexual, with Nunes messaging Victim about what he wanted to do with her sexually. Victim then began sneaking out of her house, against her parents' express wishes, to spend time with Nunes at his mother's home. Victim enjoyed going there because she could do drugs and Nunes's mother "didn't care" and never told her to go home. But Victim's father did care, and he soon secured a protective order barring any contact between Nunes and Victim. Nunes and Victim consistently disregarded the protective order. Victim also admitted, "I cared about [Nunes] because he told me things that nobody has ever told me before and it made me feel like I was actually loved by someone and that's really all I wanted at that time, because I had no one . . . ."

¶3   Nearly every time Nunes and Victim spent time together, Nunes would grope Victim and "beg[] . . . to have sex" with her, but Victim would consistently "push him off," tell him no, and say that she was "not ready." Because Victim had never been in a relationship before, she did not realize that Nunes's behavior was "not normal," and she "just kind of [went along] with it." That said, Nunes consistently abided by Victim's drawing the line at sexual intercourse during this period.

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶4      Throughout the entirety of their relationship, Nunes often talked about another girl he was dating, which made Victim angry and jealous. But whenever Victim attempted to end the relationship, Nunes threatened to kill himself or hurt Victim or Victim's father.

¶5      On December 5, 2014, Victim, then fifteen, and Nunes, then eighteen, went to Nunes's house, where he had recently moved, and began kissing on his bed. Nunes attempted to remove Victim's clothes, but she again refused to engage in sexual intercourse.

¶6      The sexual activity giving rise to the rape charge in this case occurred the next day (December 6, 2014) at Nunes's house. Before arriving, Victim messaged Nunes stating that she was "excited to see [him] and give [him] somethin somethin," which she revealed to be "shrooms and birth control."[2] When she arrived at his house, Nunes began to kiss her, and she reciprocated. Victim then "freely" followed Nunes into his bedroom, which had a red sticker on the wall "that said 'rape' and that really scared [her]." Nunes removed her clothing and propped her up on her knees while holding her head down against his bed. Victim testified at trial that Nunes at no point asked whether she wanted to have sex. To the contrary, she testified that she expressly asked him to stop "before he even did anything," but he ignored her request and inserted his penis into her anus and vagina, while she screamed and cried.[3] She

---

2. The term "shrooms" refers to mushrooms containing psilocybin, an illegal substance that produces a hallucinogenic effect "that alter[s] a person's awareness of their surroundings as well as their own thoughts and feelings." *Hallucinogens*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts/hallucinogens [https://perma.cc/NTZ3-ZJPC].

3. Victim testified that Nunes sodomized her; however, he was acquitted on this charge.

testified that she "definitely said stop once he started" and that Nunes was "doing this black magic chant while he was raping" her and "was saying this thing about demons" and how she now belonged "in his whorehouse." She also testified that after the rape, "there was blood on [her] hands and . . . all over [her]." Victim stated that the sexual assault "hurt more than anything [she had] ever experienced" and made her wonder "why . . . people enjoy sex." She later revealed that she "didn't realize that [sexual intercourse] didn't have to hurt so much."[4]

¶7      During cross-examination, Trial Counsel highlighted inconsistencies among Victim's trial testimony, her initial interview with the investigating detective (Detective), and her testimony at the preliminary hearing. In the interview with Detective, Victim said that she was initially kneeling while Nunes penetrated her anus, but she turned around and asked him if they could cuddle instead. Victim told Detective that Nunes agreed, and she shifted to her side and he began to penetrate her again. Victim also told Detective, according to his notes, that Nunes had asked her whether she wanted to have intercourse, to which she responded that she did. Additionally, at the preliminary hearing, Victim testified that her "eyes were watering but [she] wasn't really crying" and that Nunes first penetrated her vagina then her anus.

¶8      Victim testified that she did not initially realize that she had been raped after the sexual encounter with Nunes: "I didn't know what sex was supposed to be like and I didn't [know] what rape was like and I just [thought] maybe . . . this isn't meant for me or maybe I'm too young or maybe I was doing something wrong or maybe I should just get used to it." She

---

4. When Victim testified to the details of her relationship with Nunes and the sexual assault, *see supra* ¶¶ 2–6, she twice mentioned that Nunes had been in jail. Trial Counsel did not object because he "didn't want to draw attention to it."

further testified that she had always conceived of rape in different terms:

> What they tell you in school, like a girl walking down an alleyway in the middle of the night and being kidnapped by some weirdo or some guy in a van saying there's candy, come get some candy or being drugged by some college frat boy at a party. I never thought that rape could be someone that— from someone that I trusted.

After the rape, Victim told Nunes that she wanted to go home. Nunes called his mother to come pick them up, and Nunes's mother came and drove them to Victim's house. Victim said she was "trying so hard not to cry" as she sat next to Nunes in the car on the way home, but she still kissed him goodnight when she got out of the car. Once home, Victim sent Nunes a message saying, "[T]hank you lovely," and telling him that she loved him so much that she could not even "begin to put [it] into words." They also discussed getting together the next day to go snowboarding. In contrast to this seemingly affectionate behavior, Victim also testified that after she got to her house, she "just cried for a long time" and "took a long shower." She recalled thinking that she "never wanted to have sex after that if that's what sex was."

¶9    Although they did not go snowboarding the next day, they continued to exchange messages. Nunes asked Victim if she would kiss his other girlfriend in front of him, a request which greatly upset Victim. Nunes also told Victim he was angry that his other girlfriend had cheated on him, and Victim responded that Nunes "cheated on her yesterday too" and said, "[R]emember you fucked someone else last night too." Victim also told Nunes, "I gave everything away to you and you don't even fucking care. [T]hat kills me," and, "I lost my virginity to you last night and you mean everything to me, but I won't take you treating me like that."

¶10 The day after this exchange, Victim reported to her school counselor that she felt suicidal, and she was subsequently admitted to the hospital. Once discharged, Victim messaged Nunes, telling him that he was "the only thing keeping [her] here." For the next month, Nunes and Victim continued to communicate. In these messages, Victim was initially affectionate, but as the days progressed, she explicitly indicated that she did not want to see Nunes anymore, to which Nunes would respond with threats of suicide. On January 3, 2015, Victim messaged Nunes to stop contacting her.

¶11 A few days later, on January 6, Victim disclosed to her psychotherapist (Counselor), a licensed clinical social worker, that "she had lost her virginity," whereupon she "went into a full-blown panic attack, . . . hyper-ventilating . . . [and] sobbing" for about twenty minutes. After being calmed by Counselor, Victim described what happened on December 6, 2014. It became apparent to Counselor that Victim thought she was describing a sexual experience and not reporting a crime. But after hearing Victim's description, Counselor informed Victim, "[T]hat wasn't sex[;] that was rape." Victim "was relieved" by this evaluation and said she "knew that something was wrong." Counselor then told her that she was going to report the incident to Victim's parents, but Victim "begged" her not to do so. During a follow-up session two days later, Counselor convinced Victim that her parents must be told that day about the incident. Victim's father reported the rape to the Division of Child and Family Services, and on January 29, 2015, Victim was interviewed by Detective at the Children's Justice Center (CJC). Detective subsequently searched Nunes's house and found a blanket with four potential blood stains. The stains were tested, and one stain matched Victim's DNA.

¶12 In early February, Victim was examined by a doctor. The examination revealed a healed cut to her hymen. The doctor who performed the examination testified that the cut was "entirely consistent" with Victim's account of being raped, but he acknowledged that the cut could also have resulted from

consensual intercourse.[5] The examination did not reveal any sign of injury to Victim's anus, but the doctor explained, "[E]ven in acute exams, exams that are done immediately or within a few days of an assault, we seldom see anal trauma." The doctor noted that one would "not necessarily" expect to find trauma even "[i]f something went into the anus without any lubrication and against a person's will."

¶13    The State subsequently charged Nunes with one count of rape and one count of forcible sodomy, both first-degree felonies, and ten counts of violation of a protective order, class A misdemeanors. Nunes conceded at trial that he was guilty of violating the protective order multiple times, but he maintained that he had consensual sex with Victim and therefore was not guilty of rape or forcible sodomy.[6]

---

5. The doctor was speaking medically, not legally, as victims need not be subjected to physical force for sexual activity to be considered "without consent." *See, e.g.*, Utah Code Ann. § 76-5-406(11) (LexisNexis Supp. 2014) ("An act of sexual intercourse . . . is without consent of the victim . . . [if] the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate . . . .").

6. Under the then-existing statutory scheme, the age difference and acknowledgement of the sexual intercourse alone would have been sufficient to convict Nunes of unlawful sexual activity with a minor, a class B misdemeanor, given the three-and-a-half-year age difference between Nunes and Victim. *See* Utah Code Ann. § 76-5-401(2)–(3) (LexisNexis 2012) ("[An] actor . . . [who] has sexual intercourse with a minor [commits] . . . a third degree felony unless the defendant establishes by a preponderance of the evidence the mitigating factor that the defendant is less than four years older than the minor at the time the sexual activity occurred, in which case it is a class B misdemeanor."). Rather

(continued…)

¶14 At trial, Detective testified about his interview of Victim at the CJC. As Detective was describing the reason for the interview, the State asked Detective what Victim had told him about the events of December 6, 2014, and he responded that Victim said "[t]hat she had been raped." Trial Counsel did not object.

¶15 Counselor testified about the counseling session during which Victim first disclosed her sexual encounter with Nunes. After testifying about Victim's panic attack and eventual calming down, the State asked, "[W]hat words was [Victim] able to tell you?" Trial Counsel promptly lodged a hearsay objection. In response to that objection, the State argued that whatever Victim told Counselor could come in as a prior consistent statement: "It's the first statement that she made when [she was] not under the influence to make anything up and . . . [Trial Counsel] has specifically cross-examined [Victim] on the different statements that she made" at the CJC, the preliminary hearing, and at trial. The trial court responded, "Consistent

---

(…continued)

than pursue this lesser charge, the State chose to charge Nunes with rape and forcible sodomy—both first-degree felonies. *See id.* §§ 76-5-402(3), -403(4) (LexisNexis Supp. 2014). Rape, of which the jury convicted Nunes, required the State to prove "sexual intercourse with another person without the victim's consent." *Id.* § 76-5-402(1). By statute, that lack of consent can be shown in twelve specific ways, six of which were articulated in the jury instructions. *See id.* § 76-5-406(1)–(2), (4)–(6), (11). One instruction implicated the age difference between Nunes and Victim, *see id.* § 76-5-406(11), but additionally required the State to show that Nunes had "enticed or coerced [Victim] to submit or participate." Thus, the age difference alone was not enough to constitute rape under section 76-5-406(11)—it was the age difference in conjunction with enticement or coercion. It is unclear which of the six lack-of-consent theories the jury relied on in reaching its guilty verdict on the rape charge.

statements. I think once you impeach her on [a] different statement she's made, then the State can—," and before the court could complete its thought and rule, Trial Counsel withdrew the objection. Counselor went on to testify that Victim told her that Nunes "had held her down"; that Victim "begged him to stop"; that "when she was screaming for him to stop, he would do it harder"; and "that she was begging and begging and begging and begging for him to stop." Counselor testified that Victim told her that Nunes "hit her," "scratch[ed] her as hard as he could," "chant[ed] some sort of bizarre satanic crazy chant over and over," and "had drawn a symbol on her back and told her that she was part of his whorehouse now."

¶16 Mother testified that she had attended a therapy session with Victim and Counselor, and when asked whether it appeared Victim "was faking" when she described the sexual assault, Mother responded, "Not at all, no." Trial Counsel did not object to Mother's statement. Having also heard from several other witnesses, the jury convicted Nunes on one count of rape and ten counts of violation of a protective order but acquitted him of forcible sodomy. Nunes appeals the rape conviction.

ISSUES AND STANDARD OF REVIEW

¶17 Nunes raises several claims of ineffective assistance of counsel that merit our consideration. Nunes argues that Trial Counsel was ineffective for failing to object when Victim's mother (Mother) vouched for Victim's credibility, for withdrawing an objection to Counselor's hearsay testimony, and for failing to object to hearsay testimony from Detective.[7] "When

_____

7. Nunes also claims that Trial Counsel provided ineffective assistance when he "apparently withdr[ew]" an objection to Mother's hearsay testimony. But on review of the record, it is clear that Trial Counsel did not "apparently" withdraw the objection, as Nunes claims, but simply said, "Okay," after the

(continued…)

a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).[8]

ANALYSIS

¶18　"To ensure a fair trial, the Sixth Amendment [to] the U.S. Constitution guarantees the right to effective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 23, 309 P.3d 1160. To prevail on an ineffective assistance of counsel claim, Nunes must show that (1) "counsel's performance was deficient" and (2) this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure

---

(…continued)

judge explained why the testimony would be admitted. This does not appear to be a withdrawal of the objection so much as Trial Counsel accepting the ruling of the court after it was obvious he was not going to prevail on the objection.

8. Nunes also asserts that Trial Counsel "was ineffective when he failed to object, ask for a curative instruction, or move for a mistrial, when [Victim] twice mentioned that [Nunes] had been in jail." At a bench conference, Trial Counsel informed the court that he had noticed the references to jail "but didn't want to draw attention to it." This could well have been a reasonable strategic choice for Trial Counsel to make, and thus we decline to address it further. *See State v. Shepherd*, 2015 UT App 208, ¶ 52, 357 P.3d 598 (stating that not wanting to "highlight" a "troublesome point" is a possible tactical reason for "defense counsel's decision not to object"); *see also State v. Larrabee*, 2013 UT 70, ¶ 27, 321 P.3d 1136 (stating that the proposition "that there are times when counsel's decision not to object can be both strategic and proper" is "axiomatic").

to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Nunes's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶19    To succeed on the first prong, Nunes must overcome the strong presumption that his trial counsel rendered adequate assistance by persuading this court that "considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (quotation simplified). This review is "highly deferential" as it can be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Thus, "the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (quotation simplified). "If the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." *Scott*, 2020 UT 13, ¶ 35 (quotation simplified).

¶20    In evaluating a claim that counsel was deficient for failing to make an objection, deficient performance does not hinge solely on the merits of the objection. Counsel "may well have made a reasonable tactical choice" in forgoing the objection even if "there may have been grounds to object." *State v. Clark*, 2004 UT 25, ¶ 7, 89 P.3d 162. Thus, the dispositive question is whether counsel's actions "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and not whether an objection would have been well-taken.

¶21    If a defendant is able to overcome the high threshold of demonstrating that his counsel performed deficiently, he must next show that "the deficient performance prejudiced the

defense." *Id.* at 687. Counsel's deficient performance is prejudicial if "a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome." *State v. Parkinson*, 2018 UT App 62, ¶ 9, 427 P.3d 246 (quotation simplified). This requirement "is a relatively high hurdle to overcome." *State v. Apodaca*, 2018 UT App 131, ¶ 77, 428 P.3d 99 (quotation simplified), *aff'd*, 2019 UT 54, 448 P.3d 1255. "Most notably this means that a mere potential effect on the outcome is not enough." *State v. Apodaca*, 2019 UT 54, ¶ 50, 448 P.3d 1255. "Rather, the defendant must show a substantial likelihood of a different result as a demonstrable reality and not merely as a speculative matter." *State v. Heath*, 2019 UT App 186, ¶ 74, 453 P.3d 955 (quotation simplified).

## I. Mother's Testimony

¶22 Nunes first argues that Trial Counsel "was ineffective when he failed to object when Mother vouched for [Victim's] credibility." At trial, Mother testified that she attended a counseling session with Victim and Counselor during which Victim informed Mother about the rape. The State asked Mother, "When you were sitting there talking to [Victim] and she was talking to you about what happened, did it appear that she was faking?" Mother responded, "Not at all, no." Trial Counsel did not object to this question. Nunes argues on appeal that Trial Counsel was deficient in failing to object to Mother improperly vouching for Victim's credibility, pursuant to rule 608(a) of the Utah Rules of Evidence, which "permits testimony concerning a witness's general character or reputation for truthfulness but prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Adams*, 2000 UT 42, ¶ 11, 5 P.3d 642 (quotation simplified).

¶23 Assuming without deciding that Trial Counsel performed deficiently by failing to object to this vouching, this claim nevertheless fails because Nunes has not shown prejudice. First, Mother's comment was relatively isolated, coming on the second day of a four-day trial that involved thirteen witnesses. Second,

it is unlikely that the jury would have been surprised that Mother believed Victim was telling the truth. *See State v. King*, 2010 UT App 396, ¶ 46, 248 P.3d 984 (explaining that it is unsurprising that a relative would believe that a close family member is telling the truth). Given the "incidental nature of the challenged statement and the fact that most jurors are likely to assume that a mother will believe accusations of sexual abuse made by her own children, we cannot conclude that the challenged portion of [Mother's] testimony had any significant impact on the jury's decision to convict" Nunes. *See State v. Dew*, 738 S.E.2d 215, 219 (N.C. Ct. App. 2013); *see also People v. Valdez*, No. 255580, 2005 WL 1490096, at *4 (Mich. Ct. App. June 23, 2005) (per curiam) ("[I]t is highly improbable that the jurors decided the case on the basis that a mother believed her child."); *State v. Ramey*, 349 S.E.2d 566, 572 (N.C. 1986) ("It is unlikely that the jury gave great weight to the fact that a mother believed that her son was truthful. We believe this evidence had little, if any, impact on the jury's decision and did not 'tilt the scales' causing the jury to convict the defendant.").[9] Thus, there is no reasonable

---

9. It is true that our jurisprudence is replete with cases that indicate disfavor with one witness vouching for the credibility on a particular occasion of another witness, *see, e.g.*, *State v. Cegers*, 2019 UT App 54, ¶ 38, 440 P.3d 924; *State v. Burnett*, 2018 UT App 80, ¶ 40, 427 P.3d 288; *State v. Stefaniak*, 900 P.2d 1094, 1095–96 (Utah Ct. App. 1995); *State v. Iorg*, 801 P.2d 938, 941–42 (Utah Ct. App. 1990). But we disagree with the dissent's assertion that Mother's "testimony is equivalent to other testimony that has been held to impermissibly bolster another witness's credibility." *Infra* ¶ 46. Unlike a police detective or an expert witness, a mother's positive take on her daughter's believability would not have come as a surprise to the jury. *See State v. King*, 2010 UT App 396, ¶ 46, 248 P.3d 984 (distinguishing bolstering by expert witnesses from bolstering by a grandmother who reported abuse given that "as a close family member who had made such a report, it would come as no real surprise to the jury that she believed her granddaughter" and concluding that

(continued…)

probability that Nunes would have been acquitted of rape had Trial Counsel objected to Mother's vouching and moved to have that testimony stricken.

## II. Hearsay Testimony

¶24    Nunes next argues that Trial Counsel was deficient in withdrawing his objection to Counselor's hearsay statements. During Counselor's testimony, the State asked her to specify what Victim had disclosed in their January 6, 2015 therapy session. At this point, Trial Counsel properly lodged a hearsay objection. In response, the State argued that Victim's hearsay statements to Counselor were admissible as prior consistent statements pursuant to rule 801(d)(1)(B) of the Utah Rules of Evidence. Trial Counsel then withdrew the objection.

¶25    In Utah courts, prior consistent statements may be admitted as evidence of the truth of what is contained in the statement to rehabilitate a witness's testimony, but such statements are admissible only if they "were made prior to the time a motive to fabricate arose" or are admissible to rehabilitate a witness after that witness's credibility has been attacked at trial and the jury is instructed to consider such testimony only for rehabilitative purposes. *See State v. Bujan*, 2008 UT 47, ¶¶ 1, 9, 190 P.3d 1255. Here, however, Victim's statements to Counselor were most likely inadmissible as prior consistent statements because any motive Victim had to fabricate a rape allegation against Nunes would have arisen soon after the rape and before Victim made her disclosure to Counselor. *See supra* ¶ 9. And neither party asked for an instruction informing the jury that Counselor's testimony was admitted for only rehabilitative purposes. *See Bujan*, 2008 UT 47, ¶ 9. Instead of persisting in

---

(…continued)
because the grandmother's "testimony added nothing to the alleged victim's credibility, any incidental bolstering by the grandmother was harmless").

what appears to have been a non-frivolous objection to Counselor's hearsay testimony, Trial Counsel withdrew the objection. But assuming without deciding that Trial Counsel performed deficiently in withdrawing a valid hearsay objection,[10] thereby allowing Counselor to retell Victim's account

---

10. We resolve this case by assuming that Counselor's testimony was in fact inadmissible hearsay but concluding that Nunes was not prejudiced by its admission. Although neither party raises this issue on appeal and the State did not seek to rebut Trial Counsel's hearsay objection in this manner, the record demonstrates that Counselor's testimony may have been admissible under rule 803 of the Utah Rules of Evidence. Rule 803(4) creates an exception to the rule against hearsay for statements that (1) are "made for—and [are] reasonably pertinent to—medical diagnosis or treatment" and (2) "describe[] medical history; past or present symptoms or sensations; their inception; or their general cause." Utah R. Evid. 803(4). "Rule 803(4) applies to statements made to a psychiatrist or a psychologist for the purpose of medical diagnosis or treatment," and generally "all statements made to psychiatrists or psychologists, regardless of content, are relevant to diagnosis or treatment since experts in the field view everything relating to the patient as relevant to the patient's personality." *State v. Schreuder*, 726 P.2d 1215, 1224 (Utah 1986). And Utah courts have repeatedly held that statements by rape victims made to medical providers describing their abuse are admissible under rule 803(4). *See, e.g., State v. Guzman*, 2018 UT App 93, ¶¶ 29–30, 427 P.3d 401 (finding that a rape victim's statements to a nurse were made for the purposes of medical diagnosis where the victim told the nurse that she had been raped four times in response to the nurse's questioning); *State v. Burnside*, 2016 UT App 224, ¶ 43, 387 P.3d 570 (affirming a district court's finding that "in examining [the victim], the nurse practitioner was acting as a health-care professional and that [the victim's] statements to her fell within the medical treatment hearsay exception"); *State v. Sloan*, 2003 UT App 170, ¶ 21 n.2, 72 P.3d 138 (holding that a

(continued…)

of her rape to the jury, Nunes still cannot show prejudice, because the testimony at issue did not impermissibly bolster Victim's credibility or otherwise alter the evidentiary landscape in a way that had a reasonable probability of affecting the outcome of the trial.

¶26    Nunes's theory at trial was that the sexual activity was consensual and that Victim claimed otherwise only after the fact because she became jealous of Nunes's other girlfriend and began to regret that she had "lost her virginity" to him. Although "courts are more likely to reverse a jury verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue," *State v. Thompson*, 2014 UT App 14, ¶ 73, 318 P.3d 1221, Counselor's testimony merely repeated Victim's account. Because Victim spoke to Counselor after the alleged motive to fabricate arose, Counselor's testimony did nothing to undermine Nunes's theory that Victim concocted the story out of jealousy. The fact that Counselor recounted to the jury the same post-motive details (i.e., those associated with Victim's account of the rape after her alleged motive to fabricate arose) that Victim had already told the jury does not make Victim's account of the rape more or less believable. Therefore, there is no reasonable probability that Counselor's testimony tipped the credibility balance toward Victim and away from Nunes.

¶27    Moreover, Counselor did not vouch for the credibility of Victim. To be sure, in cases that hinge entirely on the veracity of the victim, we have more readily found prejudice where the

(…continued)
licensed clinical social worker's testimony regarding a sex abuse victim's out-of-court statements made during her evaluation were admissible under rule 803(4)). Furthermore, statements coming in under rule 803(4) are not limited to explaining the basis of a medical opinion but can be offered to prove the truth of the matter asserted. *Schreuder*, 726 P.2d at 1223.

challenged testimony has the effect of bolstering the victim's credibility. *See, e.g.*, *State v. Cegers*, 2019 UT App 54, ¶¶ 33, 37, 440 P.3d 924; *State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995); *State v. Iorg*, 801 P.2d 938, 941–42 (Utah Ct. App. 1990). But this is not a bolstering case. Counselor did not "offer[] a direct opinion as to [Victim's] truthfulness on a particular occasion." *See Cegers*, 2019 UT App 54, ¶ 26 (quotation simplified). She did not testify, for example, that Victim "appeared to be genuine," *see State v. Bragg*, 2013 UT App 282, ¶ 31 & n.8, 317 P.3d 452 (quotation simplified), "seemed to be quite candid about what she was telling" her, *see Stefaniak*, 900 P.2d at 1095 (quotation simplified), or displayed "indicators that would show a likelihood of honesty," *see State v. Vail*, 2002 UT App 176, ¶¶ 6, 15, 51 P.3d 1285 (quotation simplified). Nor did Counselor provide testimony "calculated to bolster [Victim's] believability by assuring the jury no credibility problem was presented by the delay in [Victim's] reporting the incident." *See Iorg*, 801 P.2d at 942. Instead, Counselor's testimony largely repeated the same facts to which Victim had already testified at length and did not address Victim's credibility.

¶28    While it is true that Victim did not testify to certain details (e.g., hitting and scratching) that Counselor mentioned, Victim did testify in vivid detail to all the other facts recounted by Counselor. In her own testimony, Victim explained that Nunes "propped [her] legs up" so that she was "kneeling" and held "the back of [her] neck so it was pressed against the bed." There was a "red sticker that said 'rape'" on his wall that "scared [her] . . . before he even did anything" to her, and she asked him to stop. Then Victim said,

> [H]e just did it and it hurt so bad and I was like screaming and crying and he was holding me down. I was telling him to stop.
>
> And he—he . . . put it in my vagina and . . . he didn't even like use anything, it was just like—felt like it was ripping and he was saying this thing

> about demons and how I [be]long in his whorehouse and like doing this black magic chant while he was raping me and I was crying and I was telling him to stop.

¶29 Victim was also asked to read the transcript of her interview with Detective, which the defense offered into evidence in its entirety, focusing specifically on the part where she explained that Nunes had held down her head, that she was screaming and crying for him to stop, and that he would go faster every time she screamed for him to stop. And the jury had already heard from Victim that she told Counselor "everything" that happened. Thus, Victim's testimony alone contained all the facts necessary to establish the elements of the offenses charged, and Counselor's recitation of what Victim told her—even with the addition of the few added details about hitting and scratching—was no more inflammatory than Victim's own account. In light of the brutal details of the rape that the jury had already heard from Victim, there is no reasonable likelihood that a single, passing reference to hitting and scratching so prejudiced Nunes that the jury would have otherwise acquitted.[11] *See State v. Jackson*, 2010 UT App 328, ¶ 17, 243 P.3d 902 (declining to find prejudice where "the alleged hearsay

---

11. For the same reasons, we reject Nunes's argument that Trial Counsel provided ineffective assistance by failing to object to Detective's testimony that Victim told him "[t]hat she had been raped." Nunes asserts that this statement amounted to hearsay testimony that "impermissibly bolstered [Victim's] testimony and enhanced her credibility," making "the jury . . . more likely to believe her story." Assuming that Detective's statement was impermissible hearsay to which Trial Counsel should have objected, we nevertheless fail to see how its admission prejudiced Nunes given that the jury had already heard Victim's vivid description of the rape, *see supra* ¶¶ 6, 28–29, and Detective's comment about why he was investigating was not a comment on Victim's veracity.

evidence was cumulative because it reiterated the essence of testimony presented by the victims or other eyewitnesses"), *overruled on other grounds by State v. DeJesus*, 2017 UT 22, 395 P.3d 111.

¶30 Nunes argues that Counselor's retelling of Victim's allegations was especially prejudicial because Victim's behavior before and after the rape called her credibility into question in the eyes of the jury. But Counselor did not make any statements regarding Victim's credibility; she simply relayed to the jury what Victim had disclosed to her. To the extent that Victim's conduct before and after the rape cast doubt on her veracity, Counselor's retelling of Victim's disclosures would have done little to allay that doubt. More likely, the jury found Victim's explanations for her conduct believable.[12]

¶31 Victim testified at length regarding why she acted as she did after the rape. She testified about Nunes's manipulative

---

12. This court's prior caselaw has reiterated that "rape victims display a diverse range of reactions to the harm they suffered," including, but not limited to, "shame, shock, resignation, humiliation, fear, embarrassment, confusion, and/or disbelief." *State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610, *cert. granted*, 456 P.3d 386 (Utah 2019). The jury appears to have understood that despite the persistence of certain cultural myths, not all rape victims will immediately report the attack or have no further interaction with their rapists. *See In re J.F.S.*, 803 P.2d 1254, 1259 (Utah Ct. App. 1990) (concluding that a victim's "delayed reporting is not inconsistent with her claim that she was raped" and explaining that "[t]he embarrassment and shame that is characteristic of rape victims prevents many victims from reporting the incident"); *see also* Amy M. Buddie & Arthur G. Miller, *Beyond Rape Myths: A More Complex View of Perceptions of Rape Victims,* 45 Sex Roles 139, 140 (2001) (defining "rape myths" as "prejudicial, stereotyped, or false beliefs about rape, rape victims, and rapists" (quotation simplified)).

behavior, how he "got inside [her] head," and the "things that he said that just made [her] feel like [she] had no choice but to . . . go back to him." She testified that she would tell him "all the time" that she wanted to leave the relationship, but he would threaten suicide or threaten to "hurt [her] dad" by "beat[ing] him until his blood is running down the drain." She explained that she kept telling him that she loved him and "kept going back to him because [she] was scared." She testified that on the night of the rape, she "hugged" him when he dropped her off at home "not because [she] wanted to" but because she "was never comfortable saying no," and she later sent him "loving" text messages because she "was scared of what would happen if [she] didn't."

¶32    Victim also explained that she did not realize she had been raped, because she "didn't [know] what rape was like" or that such an act could be committed by "someone that [she] trusted." Victim testified that in her mind, rape was "like a girl walking down an alleyway in the middle of the night and being kidnapped by some weirdo or some guy in a van saying there's candy . . . or being drugged by some college frat boy at a party." Although she may not have realized that Nunes's conduct amounted to rape, Victim's parents testified that her mental health changed dramatically the day after the rape and that she was soon admitted to the hospital for suicidal ideation. Victim also testified that she told Counselor that she felt "violated" and was having "flashbacks" of the encounter, even before she understood that she had been raped.

¶33    In short, we do not believe that Counselor's repetition at trial of the details of the rape, even with the addition of other details, significantly altered the evidentiary picture in a way that affected the outcome of the trial. Trial counsel made Victim's pre- and post-rape behavior the centerpiece of the defense at trial in an attempt to cast doubt on Victim's credibility. Yet the jury believed Victim's testimony that she did not consent to sexual

intercourse with Nunes despite how she reacted after the fact.[13] Counselor's retelling of the details of the rape that Victim had already told the jury could not have tipped the scales in favor of a guilty verdict if the jury did not believe the bulk of Victim's testimony in the first place. For if the jury had been inclined to

---

13. The dissent points out that the jury must have had issues with Victim's credibility because the jury acquitted Nunes of sodomy. *See infra* ¶¶ 36, 50. While a split verdict may be consistent with the notion that the jury was conflicted about the evidence or had some doubt about a victim's credibility, *see State v. Richardson*, 2013 UT 50, ¶ 44, 308 P.3d 526, it may also just as legitimately suggest compromise or some leniency in favor of Nunes, *see State v. Payne*, No. 119,083, 2019 WL 4551642, at *9 (Kan. Ct. App. Sept. 20, 2019) ("But reading the tea leaves of a jury's mixed verdicts on multiple counts against a defendant is fraught with inexactitude and guesstimating as a general exercise, especially given the breadth of considerations that may influence deliberations in any particular case."); *see also United States v. Powell*, 469 U.S. 57, 64–67 (1984) (recognizing that even truly inconsistent verdicts "should not necessarily be interpreted as a windfall to the Government at the defendant's expense" because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense"). Moreover, a jury verdict in which a defendant is convicted of rape but acquitted of sodomy does not necessarily mean the jury had doubts about the victim's claim of rape. Aware that Victim was young and inexperienced, the jury may well have chosen to believe Victim's account of rape, which claim was supported by some slight physical evidence, while having a reasonable doubt about whether she was sodomized in the absence of any sign of trauma. *See State v. Lopez*, 892 P.2d 898, 902 (Idaho Ct. App. 1995) ("A reasonable doubt as to one detail of [a] victim's testimony did not require [the jury] to disbelieve the rest of her testimony." (quotation simplified)).

accept the defense theory that Victim's post-rape reactions were so inconsistent with rape that her later allegations must have been fabricated, it would mean that Victim was also lying when she spoke to Counselor. In that scenario, it is difficult to imagine how Counselor's recitation of Victim's allegedly false story could have influenced the jury's verdict. Under the circumstances of this case, there is no reasonable probability that Nunes would have obtained a more favorable outcome at trial without Counselor's testimony.

## CONCLUSION

¶34 Assuming that Trial Counsel rendered deficient performance in failing to properly object to various testimonial statements made by Mother, Counselor, and Detective, Nunes has not shown that he was prejudiced by these alleged deficiencies. Therefore, we affirm.

———————

ORME, Judge (dissenting):

¶35 I respectfully dissent. I believe that Trial Counsel was deficient in two respects: first, when Trial Counsel withdrew his objection to hearsay testimony offered by Counselor and, second, when he failed to object to bolstering testimony by Mother. Each of these instances are prejudicial to Nunes in their own right—and all the more so in combination—and they entitle him to a new trial.

¶36 At the outset I make a preliminary comment. The jury in this case had substantial doubts about Victim's credibility. It did not believe her claim that she was sodomized, and it acquitted Nunes of that charge. There was no physical evidence conclusively pointing to rape, no disinterested witness to the crime, and no confession, *see generally State v. Burnett*, 2018 UT App 80, ¶¶ 39–41, 427 P.3d 288, so the State's case turned on

Victim's credibility. This suggests that essentially any evidence that came in that tended to enhance Victim's credibility potentially tipped the balance in favor of the jury believing her testimony. *See id.* ¶ 39 ("Our supreme court has indicated that a split verdict can be an indication that the jury was conflicted about the evidence and the competing version of events offered by the victim and the defendant, and that [certain errors] may very well have mattered.") (quotation simplified). Understood from this perspective, the improper evidence that came in in this case was prejudicial.

## I. Counselor's Hearsay Testimony

¶37 Before the complained-of testimony by Counselor, the groundwork was laid as to what Counselor was going to be testifying about and in what capacity. At the beginning of Counselor's testimony, during a point when Counselor was explaining her extensive training focused on adolescents, Trial Counsel objected when he thought Counselor was going to start vouching for Victim, arguing:

> This is a fact witness, not an expert witness and we've been spending a lot of time with her credentials and she's now trying to get into the idea that adolescents work well with her and all that in an attempt to vouch for [Victim's] credibility. She's supposed to be a fact witness, not an expert.

The prosecutor responded, "I haven't asked her an expert question yet," and a moment later stated that "[u]nder 704, as a lay witness, she can testify about what's happening in her presence." The prosecutor also informed Trial Counsel that Counselor was "not going to say that [Victim] said anything." Later, during the substance of Counselor's testimony, Trial Counsel again objected, and the court stated that as "a lay person" Counselor could continue testifying about her *observations* of Victim.

¶38    The complained-of hearsay testimony offered by Counselor came in when the prosecutor asked Counselor what Victim told her during the January 6, 2015 counseling session. Trial Counsel properly lodged a hearsay objection. The prosecutor then argued that the statements were admissible because "[i]t's the first statement that she made when [she was] not under the influence to make anything up and . . . [Trial Counsel] has specifically cross-examined [Victim] on the different statements that she made" at the CJC, the preliminary hearing, and at trial. In response, Trial Counsel affirmatively withdrew the objection. Counselor proceeded to testify that Victim told her that Nunes "had held her down, that she had begged him to stop[;] [t]hat when she was screaming for him to stop, he would do it harder"; and that Nunes "hit her" and "was scratching her as hard as he could." She also testified that Victim told her "that she was begging and begging and begging and begging for him to stop," but Nunes would not stop and "was chanting some sort of bizarre satanic crazy chant over and over" and "had drawn a symbol on her back and told her that she was part of his whorehouse now."

¶39    My colleagues assume that Trial Counsel's withdrawal of his valid objection was deficient and decide this issue on the basis of a lack of prejudice—essentially because Counselor's account of the alleged rape was cumulative of Victim's testimony. In my view, withdrawing the objection was indeed objectively deficient because it fell below an objective standard of reasonableness. And in the context of Victim's questionable credibility in the eyes of the jury, Counselor's testimony was clearly prejudicial because it impermissibly strengthened Victim's credibility in a case that turned on credibility.

¶40    Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement," Utah R. Evid. 801(c), and is ordinarily inadmissible at trial, *id*. R. 802. Statements that are not considered hearsay include those in which

> [t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . is inconsistent with the declarant's testimony or the declarant denies having made the statement or has forgotten, or . . . is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying.

*Id*. R. 801(d)(1)(A)–(B). However, prior consistent statements are admissible "to prove the truth of the matter asserted," *id.* R. 801(c), only if they "were made *prior* to the time a motive to fabricate arose," *State v. Bujan*, 2008 UT 47, ¶ 1, 190 P.3d 1255 (emphasis added).

¶41 Prior consistent statements may also come in for non-substantive rehabilitative purposes, meaning the statements may be admitted not for the truth of the matter asserted in the statement but to rehabilitate a witness's credibility after it has been attacked. *See id.* ¶ 9 ("We have recognized under common law the admissibility of prior consistent statements for rehabilitative purposes."). *See also State v. Sibert*, 310 P.2d 388, 391 (Utah 1957) ("[W]here there has been an attempt to impeach or discredit a witness, prior statements consistent with his present testimony may be offered to offset the impeachment."). When prior consistent statements are admitted for rehabilitative purposes, a limiting instruction should be "provided to the jury that the testimony was only admitted for rehabilitative purposes." *Bujan*, 2008 UT 47, ¶ 9. Otherwise, "the testimony [is] inappropriate hearsay and its admission improper." *Id.*

¶42 Rule 801(d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication . . . only when those statements were made before the charged recent fabrication." *Tome v. United States*, 513 U.S. 150, 167 (1995). Here, any of Victim's statements to Counselor were inadmissible under the rule because, had Victim

fabricated her account as Nunes asserts, her motive to do so would have arisen soon after the alleged rape and before she spoke to Counselor. Specifically, when Nunes continued to discuss his other girlfriend with Victim, she responded, "I gave everything away to you and you don't even fucking care. [T]hat kills me," and "I lost my virginity to you last night and you mean everything to me, but I won't take you treating me like that." Because Victim's motive to fabricate a rape claim arose the day after the alleged rape—when she expressed jealousy toward the other girlfriend and expressed remorse for losing her virginity to Nunes—Counselor's testimony about what Victim told her concerning the alleged rape, having come after this motive to fabricate arose, are inadmissible as prior consistent statements. *See Bujan*, 2008 UT 47, ¶ 11.

¶43 The State appears to concede that the statements were not admissible as substantive evidence on the prior-consistent-statement rationale, but it argues that the statements were nonetheless admissible as non-hearsay because they amounted to "non-substantive rehabilitation." But even if the State had offered the statements for their non-substantive rehabilitative value, which was *not* the explanation offered at trial, no instruction was given to the jurors to inform them "that the testimony was only admitted for rehabilitative purposes." *Id.* ¶ 9. Thus, the statements offered by Counselor were "inappropriate hearsay and [their] admission improper." *Id*. Trial Counsel should have stood by his objection. Failing to do so "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (quotation simplified).

## II. Mother's Bolstering

¶44 My colleagues again assume, for purposes of their analysis, that it was deficient for Trial Counsel not to object to Mother's vouching for her daughter's truthfulness, and they decide this issue on prejudice grounds. I conclude that it was deficient performance and prejudicial in the posture of this case.

¶45    At trial, Mother testified that she attended a counseling session with Victim and Counselor during which Victim informed Mother about the alleged rape. The State asked Mother, "When you were sitting there talking to [Victim] and she was talking to you about what happened, did it appear that she was faking?" Trial Counsel did not object to this question. Mother responded, "Not at all, no."

¶46    Rule 608(a) of the Utah Rules of Evidence "permits testimony concerning a witness's general character or reputation for truthfulness but prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Adams*, 2000 UT 42, ¶ 11, 5 P.3d 642 (quotation simplified). Here, Mother's testimony that Victim was not faking "was not an opinion about [Victim's] general character for truthfulness, but a direct opinion of [Victim's] truthfulness on a particular occasion" and was therefore inadmissible. *See State v. Cegers*, 2019 UT App 54, ¶ 24, 440 P.3d 924 (quotation simplified). This testimony is equivalent to other testimony that has been held to impermissibly bolster another witness's credibility. *See, e.g.*, *Adams*, 2000 UT 42, ¶¶ 19-20 (holding that a detective's testimony that the victim did not appear to be coached was impermissible bolstering); *State v. Rimmasch*, 775 P.2d 388, 392–93 (Utah 1989) (holding that an expert's testimony that he believed the victim was telling the truth was inadmissible bolstering), *superseded by rule on other grounds as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892; *State v. Bragg*, 2013 UT App 282, ¶ 31, 317 P.3d 452 (holding that a detective's testimony that the victim "appeared 'to be genuine'" during an interview "clearly violated rule 608"); *State v. Vail*, 2002 UT App 176, ¶¶ 6, 15, 51 P.3d 1285 (holding that a detective's testimony that the victim seemed credible and trustworthy during an interview was inadmissible bolstering); *State v. Stefaniak*, 900 P.2d 1094, 1095–96 (Utah Ct. App. 1995) (holding that a social worker's testimony that the victim "seemed to be quite candid" during an interview was inadmissible). It is exclusively the factfinder's role to determine witness credibility, *see State v. Workman*, 852 P.2d 981, 984 (Utah 1993), and allowing Mother to vouch for the believability of her

daughter "had the potential to usurp the fact-finding function of [the] jury," *Stefaniak*, 900 P.2d at 1096 (quotation simplified). Objectively reasonable counsel would have objected to the question that called for Mother's take on Victim's truthfulness, would have moved to have the vouching testimony stricken if it did come in, and would have asked for a limiting instruction if the trial court did not strike the testimony outright.

## III. Prejudice

¶47    Having concluded that Trial Counsel rendered deficient performance in withdrawing his objection to Counselor's hearsay testimony and in failing to object to Mother's impermissible bolstering, I believe that either of these instances of deficient performance, let alone the two combined, prejudiced Nunes. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). When we determine that an attorney's deficient performance was not prejudicial, it is often because the evidence against a defendant is so overwhelming that the jury would have rendered the same result whether or not counsel had performed deficiently. *See, e.g., State v. Lopez*, 2019 UT App 11, ¶ 35, 438 P.3d 950 (holding that due to the "overwhelming evidence . . . introduced at trial" there was "no reasonable probability" that had the error not occurred, the jury would have acquitted the defendant); *State v. Courtney*, 2017 UT App 172, ¶ 23, 424 P.3d 198 (holding that the "evidence against [the defendant] was so overwhelmingly strong" that any error at trial was harmless). And the opposite is likewise true. *See State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984 ("While we more readily find errors to be harmless when confronted with overwhelming evidence of the defendant's guilt, we are more willing to reverse when a conviction is based on comparatively thin evidence.") (quotation simplified); *State v. Havatone*, 2008 UT App 133, ¶ 17, 183 P.3d 257 (reversing a conviction because the errors, "when combined and considered with the weakness of the evidence," warranted a new trial).

¶48 The other evidence against Nunes was not so overwhelming that I can say with confidence that he was not prejudiced by admission of Counselor's hearsay statements or Mother's impermissible bolstering of Victim's credibility. Nunes insisted the sexual encounter was consensual while Victim claimed it was not, and the State presented no conclusive physical evidence of rape.[14]

¶49 There was evidence before the jury that might well have caused it to question Victim's account, even if doing so would not be consistent with enlightened perspectives on the behavior of rape victims. Before the alleged rape, Victim messaged Nunes telling him that she was "excited to see [Nunes]" and that she was bringing "shrooms and birth control." When Victim arrived at Nunes's home, Nunes began to kiss Victim, and she kissed him back and freely followed him to the bedroom. According to Detective, Victim told him that Nunes asked if she wanted to have sex, to which she responded affirmatively. While the jury may well have hesitated to read too much into Victim's pre-sex behavior, mindful that Victim was free to change her plans and withdraw her consent even after consensual sex began, it might well have viewed her *subsequent* conduct as inconsistent with her being a victim of rape. Especially in the absence of the inadmissible testimony, the jury might have found it significant that Victim voluntarily and affectionately interacted with Nunes immediately after the alleged rape and for the subsequent month with no hint that the sexual encounter was anything but consensual. For example, after the alleged rape, on the way to Victim's home, she sat next to Nunes in the car and hugged and kissed him goodnight when she got out of the car. Victim then sent Nunes a message saying "thank you lovely" and that she

---

14. The State offered into evidence testimony about a single blood spot on Nunes's sheet that matched Victim's DNA and a healed cut to Victim's hymen, but the State's own expert testified that the cut could have resulted from either rape or consensual sex.

loved him so much that she could not even "begin to put [it] into words." Moreover, after Nunes expressed his anger over the other girlfriend cheating on him, Victim messaged him that he had cheated on that girl, too, referring to his sexual encounter with Victim. Victim also told Nunes, with my emphasis, "I *gave* everything away to you and you don't even fucking care. [T]hat kills me," and "I lost my virginity to you last night and you mean everything to me, but I won't take you treating me like that."[15] She then continued to express her love for Nunes for another month before informing him that she no longer wanted any contact with him and reporting the incident to Counselor and nothing in our rules of evidence prohibited evidence of Victim's subsequent behavior from being presented to the jury for its consideration. This evidence surely does not entitle Nunes to an acquittal, and he could well be convicted again if accorded the retrial he deserves, but because the remaining evidence against him was far from overwhelming, it does suggest that, without Counselor's hearsay testimony recounting the alleged rape and Mother's vouching for Victim's credibility, "a reasonable probability exists that . . . [Nunes] would have obtained a more favorable outcome." *State v. Parkinson*, 2018 UT App 62, ¶ 9, 427 P.3d 246 (quotation simplified).

¶50    As noted, this case turned on Victim's credibility, about which it is inarguable that the jury had doubts. It is entirely possible that Counselor's hearsay testimony, especially in conjunction with Mother's impermissible bolstering, tipped the credibility balance toward Victim and away from Nunes. Their maturity and, in the case of Counselor, professional training, may well have made Counselor and Mother more credible witnesses in the eyes of the jurors than Victim. And Counselor did not merely repeat Victim's claim that she had been raped, which is problem enough in a case as close as this one. Instead, Counselor included graphic details that Victim herself did not

---

15. The reference is clearly not to Nunes raping Victim but to Nunes carrying on with his other girlfriend.

testify to, such as Nunes hitting and "scratching her as hard as he could" and raping her "harder" when she screamed for him to stop. And due to the he-said-she-said nature of the evidence, the testimony of a licensed clinical social worker that repeated and embellished Victim's account may well have counted for a lot in the eyes of the jury. True, as the majority points out, most of Counselor's testimony was cumulative in a technical sense, but in a close case like this one, hearing the same damning evidence twice may well give it greater weight in the eyes of the jury even if she had not added anything new. And the doubts the jury had about Victim's credibility might well have been minimized during deliberations in view of the more polished testimony presented by a trained professional.

¶51 And regarding Mother's bolstering, our jurisprudence is replete with cases that have found prejudice when improper bolstering evidence was admitted, there was little or no physical evidence of the crime, and the State's case hinged on the credibility of the victim. *See State v. Cegers*, 2019 UT App 54, ¶¶ 37–38, 440 P.3d 924 (holding that the defendant was prejudiced from the admission of improper bolstering when "the jury's verdict hinged on its assessment of the victim's credibility"); *State v. Burnett*, 2018 UT App 80, ¶¶ 39, 41, 427 P.3d 288 (holding that "had counsel properly objected to [the expert's] testimony regarding credibility" in a case where "there was no confession, no third-party eyewitnesses, and no physical evidence" there was "a reasonable probability that [the defendant] would have obtained a more favorable outcome at trial"); *State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995) (holding that testimony bolstering the victim's credibility was prejudicial as the case "hinged entirely on the credibility of the victim"); *State v. Iorg*, 801 P.2d 938, 941–42 (Utah Ct. App. 1990) (holding that testimony that "was clearly calculated to bolster [the victim's] believability" in a case that "hinged on credibility" was prejudicial). Regardless of the fact that Victim was Mother's child, no witness is allowed to bolster another witness's believability and doing so is invariably prejudicial when the case hinges on that witness's credibility. And this case assuredly

turned on Victim's credibility as evidenced by Nunes's acquittal on the sodomy charge. There was no compelling physical evidence of the alleged rape, "no confession, no third-party eyewitnesses," *Burnett*, 2018 UT App 80, ¶ 39, and the jury clearly had issues with Victim's credibility. Thus, there is a reasonable probability that the jury would have found Victim incredible without Mother's bolstering and come to a more favorable conclusion for Nunes at trial.

¶52 Without the hearsay testimony of Counselor and Mother's impermissible bolstering, there is at least a reasonable probability of Nunes receiving a better result at trial, especially in light of the sparse physical evidence and the case hinging almost solely on Victim's credibility. *See State v. Thompson*, 2014 UT App 14, ¶ 73, 318 P.3d 1221 ("[C]ourts are more likely to reverse a jury verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue."). *See also State v. Larrabee*, 2013 UT 70, ¶¶ 35–37, 321 P.3d 1136 (holding that counsel's deficient performance prejudiced the defendant when there was little physical evidence and the case hinged on the victim's credibility); *Gregg v. State*, 2012 UT 32, ¶¶ 26–30, 279 P.3d 396 (same); *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) (same); *State v. Bujan*, 2006 UT App 322, ¶¶ 30–32, 142 P.3d 581 (same), *aff'd*, 2008 UT 47, 190 P.3d 1255. It is clear to me that "there is a reasonable probability that, but for [Trial Counsel's] unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 688, 694 (1984). I would therefore vacate Nunes's rape conviction and remand for a new trial on that charge.

―――――――