**2023 UT App 85**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ZACHARY SOL MILLER,
Appellant.

Opinion
No. 20220059-CA
Filed August 3, 2023

First District Court, Logan Department
The Honorable Brandon J. Maynard
The Honorable Spencer D. Walsh
No. 201100024

Benjamin Miller and Debra M. Nelson,
Attorneys for Appellant

Sean D. Reyes and Christopher A. Bates,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

ORME, Judge:

¶1 Zachary Sol Miller appeals his conviction of object rape, a first-degree felony. He argues that his defense counsel (Counsel) was constitutionally ineffective in two respects, and he seeks remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with facts to support a third claim of ineffective assistance of counsel. He additionally argues that the trial court erroneously admitted hearsay testimony under the medical-diagnosis-or-treatment hearsay exception set forth in rule 803(4) of the Utah Rules of Evidence. We affirm his conviction and deny his rule 23B motion.

## BACKGROUND[1]

### *The Assault*

¶2      Miller and Colleen[2] were friends who frequently socialized as part of a larger friend group. On one such occasion in March 2019, the group, including Miller and Colleen, went to a party at a friend's house. Around 1:00 a.m., Colleen and a female friend (Friend 1) returned to Colleen's house and continued to socialize. Shortly thereafter, Miller and one of his male friends (Friend 2) also arrived at her house, soon followed by Friend 1's boyfriend. "It was normal" for Miller and others to meet at Colleen's house following an event "to continue hanging out." On such occasions, it was also common for Colleen and some friends to sleep on Colleen's bed in a "[s]trictly platonic" manner. Miller had previously slept with Colleen in her bed "a couple of times," but such episodes were "[n]ever" sexual in nature.

¶3      At one point during the night in question, Friend 2 left the gathering, leaving Colleen, Miller, Friend 1, and Friend 1's boyfriend in the home. Then, shortly after 3:15 a.m., Colleen, who by then was "[e]xtremely tired," announced that she was going to bed and said her goodbyes. She told the group that she had plans to meet with her girlfriend later that day to celebrate her girlfriend's birthday and that she intended to take medication to help ensure she got enough sleep. Colleen then took Advil PM

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rogers*, 2020 UT App 78, n.2, 467 P.3d 880 (quotation simplified), *cert. denied*, 470 P.3d 445 (Utah 2020).

2. A pseudonym.

and went to bed. She had also consumed approximately five alcoholic drinks that night.

¶4 At trial, Colleen testified that she went to sleep wearing "a pair of running shorts and then a T-shirt on top." Miller, Friend 1, and Friend 1's boyfriend remained in the kitchen after Colleen retired to her bedroom. The three "hung out" for a while longer until Friend 1 and her boyfriend decided to head home. Friend 1 offered to drive Miller home, but he declined, stating that he would walk.

¶5 Around 4:30 a.m., Colleen, who was sleeping on her side and facing the wall her bed was pushed against, was awakened by a "sensation in [her] genital area." Colleen soon realized that Miller had joined her in bed. He had laid down behind her and removed her shirt. He then partially pulled down her shorts, reached "up between" her legs, and inserted his fingers into her vagina. Miller did not remove his fingers for "a span of minutes." Colleen, who was "[c]ompletely groggy," pretended to fall back asleep in hopes that it would end the assault.

¶6 At trial, Colleen additionally testified that Miller then pulled her onto her back, completely removed her shorts, and put his mouth on her vagina. Colleen stated that she resisted by repeating "no" and "nuh-uh" and by placing her feet on his shoulders and trying to push and kick him away with "[q]uite a bit of force." She testified that while holding her down by her arms with enough force to leave marks, Miller then sucked on, kissed, and bit her neck and lips and forced her to touch his penis with her hand. She also stated that he tried to insert his penis into her vagina, but she was able to prevent this by covering her vagina with her hand.[3]

---

3. The jury did not convict Miller on the charges arising from this additional alleged conduct.

¶7 When the assault came to an end, Colleen immediately went to the bathroom, where she remained for some time. There, she discovered red marks on one of her arms and discoloration on her neck, of which she then took pictures. Sometime between 6:00 a.m. and 7:00 a.m., Colleen, who was feeling distraught, hurt, and angry, texted her girlfriend and another friend. Colleen told the other friend that "something had happened" and that she "needed her."

¶8 When Colleen returned to her bedroom, she found Miller asleep in her bed. She woke him up and told him that he needed to leave. Because she was "in shock" and "freaking out," Colleen decided to drive Miller home so that she could be sure he was no longer in her house. During the drive, Miller acted as if nothing had happened and even asked whether they were still meeting for brunch later that day. Colleen did not respond to this question.

¶9 After dropping Miller off, Colleen returned home and remained there for an hour before her girlfriend arrived, soon followed by the other friend she had texted earlier that morning. The friend then took Colleen to the hospital, where she was examined by a sexual assault nurse examiner (Nurse). Colleen testified at trial that she wore "a black long-sleeved Van's shirt and then a pair of jeans" to the exam. Following the exam, the emergency room physician and Nurse recommended "medications for sexually transmitted infection prevention, and pregnancy prevention," which were provided to Colleen. Colleen did not wish to speak to the police officers who responded to the hospital, and the case became inactive.

¶10 A little over three months later, in June 2019, Colleen reported the sexual assault to law enforcement. At trial, she explained that she was initially hesitant to do so because she was a "low-key" and private person, because she and Miller had many mutual friends and she was worried that reporting his sexual assault would negatively affect those friendships, and because she wished to avoid the "stigma that comes with" reporting sexual

assault. Although she felt relieved when she finally reported Miller to the police, she testified that as a result of the assault, she was diagnosed with "PTSD, anxiety, and depression."

## *The Trial*

¶11  The State charged Miller with object rape, forcible sodomy, and forcible sexual abuse. The case then proceeded to a two-day jury trial in November 2021. As part of its case-in-chief, the State called Colleen, Friend 1, and Nurse to testify. Colleen's testimony was largely as recounted above. She also testified that at the time of the assault, she and her girlfriend had been dating for "[a]bout two months" but that "there was never any title or any agreement to be exclusive." Despite this, Colleen testified that for moral reasons, she never would have willingly had sexual relations with anyone else. She also stated that although her girlfriend likely "would have been hurt," "there wouldn't really be any repercussions" if she had engaged in sexual relations with another because the two were not exclusive. And when asked on cross-examination why, under "describe patient's dress during assault" on Nurse's form, Nurse had written that Colleen was wearing jeans and a T-shirt during the assault, Colleen stated that she did not recall saying that but that she had worn jeans and a T-shirt to the medical exam.

¶12  Friend 1 testified that on the night in question, she, her boyfriend, Miller, and Friend 2 all went to Colleen's house, where everyone except her boyfriend "had a few drinks." She stated that when Colleen decided to go to sleep, Colleen told everyone that she "had a long day the next day" and "that she was going to take a sleeping pill," but Friend 1 did not witness her actually take any medication. Friend 1 also said that she, her boyfriend, and Miller socialized for a bit longer and that Miller had declined her offer to give him a ride home when she and her boyfriend decided to leave. She also stated that before leaving, she looked into Colleen's room and saw that Colleen was asleep.

¶13 Nurse testified concerning her examination of Colleen. She explained the steps she undertakes in a sexual assault examination, which include obtaining the patient's medical history, asking a set of standardized questions concerning the sexual assault, and conducting a comprehensive physical examination of the patient. Nurse then proceeded to testify concerning her examination of Colleen. When the State asked Nurse to recount the verbal history she obtained from Colleen, Counsel objected on hearsay grounds. The State responded that the testimony was admissible under rule 803(4) of the Utah Rules of Evidence as a "statement made for medical diagnosis or treatment." The trial court overruled Counsel's objection and additionally noted that, had the objection been sustained, Counsel would likewise be precluded from asking Nurse about Colleen's statement to her that she had been wearing jeans at the time of the assault.

¶14 Nurse then testified that Colleen told her that she "had some friends over for a get-together and there had been some alcohol and [she] started not to feel well, so she stated that she took an Advil PM and went to bed." Colleen then told her that "she woke up laying in bed with [Miller] behind her and he was, in her words, 'fingering her.'" Nurse further testified that Colleen told her "that she had said no, and it continued" and that later "he, in her words, 'went down on her,'" and she pushed him away. Colleen told her "that at that point her pants and underwear came off and he attempted to penetrate her, but again, she pushed him away." Colleen told Nurse that, following the assault, she "got up and went to the bathroom."

¶15 Nurse next testified concerning Colleen's answers to the standardized questions Nurse asked her, which answers Nurse recorded, to the best of her ability, "verbatim." This included Colleen's answers in the affirmative to the questions of whether Miller's "penis or genitals contacted her genitals," whether his "mouth contacted her genitalia," whether his "mouth contacted her breasts," whether his "mouth contacted her mouth," whether

his "hands contacted her genitals," and whether his "hands contacted her breasts." When asked whether Miller's "mouth contacted any other area of her body," Colleen responded "'yes' he contacted her neck." In response to whether she had "used drugs or alcohol before . . . the assault," Colleen indicated "that she had had vodka that night, and she took Advil PM before she went to bed," but she was unwilling to provide blood or urine samples. Nurse also wrote down that when asked to "describe [her] dress during assault," Colleen responded "jeans" and "a white T-shirt."

¶16   Nurse next described her physical examination of Colleen. She indicated that Colleen "had multiple bruises" on her neck that appeared to be hickeys. Nurse testified that other than the bruises on Colleen's neck, "every other part of her body appeared to be normal," and she observed no marks on Colleen's arms. The State also submitted into evidence photographs Nurse took of the bruises.

¶17   Miller called three of his friends to testify in his defense. Friend 2 testified regarding the gathering at Colleen's house on the night of the assault. He stated that although Miller and Colleen were "quite friendly that night" and "seemed very comfortable" with each other, there was not "anything of a sexual nature" between them. Friend 2 further recounted that when he left Colleen's house, he went to Miller's house and fell asleep. When he woke up a few hours later, Miller and a friend (Friend 3) were just arriving home in the morning. Friend 2 testified that he noticed "multiple" hickeys on both sides of Miller's neck and, because Miller was "not usually the type to kiss and tell," he "took the chance to make fun of him like any guy would," which Miller "just shrugged . . . off." When asked by Counsel whether he had observed the hickeys on Miller's neck the night before, Friend 2 responded, "No."

¶18   Another of Miller's friends similarly testified that "sometime in March of 2019," he observed "quite a few hickeys

along [Miller's] neck on both sides." The friend similarly joked that "it looked like someone had a fun night," which Miller also responded to by "shrugg[ing] it off."

¶19 Friend 3 testified that on the morning following the assault, Miller called him sounding "very upset" and asked whether "he could come over and speak to my wife and I." Miller arrived at Friend 3's house "very, very upset" and "in tears." He pointed to "somewhere between three to five" "very noticeable" bruises on his neck and asked what they looked like. When Friend 3 and his wife responded that the bruises "look like hickeys," Miller proceeded to tell them that the night before he had been "with some friends" at Colleen's house where "they all got quite drunk" and "he ended up sleeping with" Colleen.[4] Friend 3 recounted that Miller told him that Colleen gave him a ride home that morning and that "he thought everything was fine" until he received a text message from Colleen's girlfriend accusing him of sexually assaulting Colleen. Friend 3 stated that Miller had very adamantly denied the accusation and that Friend 3 and his wife "were shocked that the[re] were even accusations because [the bruises on Miller's neck] obviously looked like hickeys."

¶20 During closing argument, Counsel stated that this was "indeed a case of buyer's remorse." He stated that Colleen's plan to have "a quick fling with [Miller] and move on the next day as if nothing had ever happened" was foiled by the hickeys that were left on her neck. He argued that because Colleen was supposed to meet with her girlfriend in a few hours to celebrate her girlfriend's birthday, and because her girlfriend would "likely be hurt" by Colleen's sexual encounter with Miller, Colleen "came up with the only story she could" "to explain away the hickeys"—i.e., "remove consent from the equation." Counsel emphasized that the hickeys on Miller's neck were "proof positive that she was an

---

4. The State objected to this testimony on hearsay grounds. Counsel responded that it was admissible as an excited utterance, and the trial court overruled the objection.

active and willing participant in everything that occurred between them." Counsel made no mention during closing of the contradiction between Colleen's trial testimony that she wore "running shorts" during the assault and Nurse's notation that Colleen told her she had worn jeans during the assault.

¶21 The jury convicted Miller of object rape, which charge was based on the allegation that Miller inserted his fingers inside Colleen's vagina while she slept. But the jury acquitted him of forcible sodomy and forcible sexual abuse, which were based on his alleged conduct after Colleen awoke. Miller appeals.

ISSUES AND STANDARDS OF REVIEW

¶22 Miller challenges his conviction of object rape on several grounds. First, he argues that Counsel rendered ineffective assistance by not moving for a directed verdict on the ground that there was insufficient evidence to support his conviction. Second, he asserts that Counsel was ineffective for not highlighting during closing argument the "critical discrepancy" between Colleen's trial testimony and what she told Nurse she was wearing during the sexual assault. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (quotation simplified), *cert. denied*, 525 P.3d 1254 (Utah 2022).

¶23 Third, Miller argues that the trial court erred in permitting "Nurse to testify essentially verbatim to [Colleen's] statements made during the sexual assault exam" under the hearsay exception provided for in rule 803(4) of the Utah Rules of Evidence. "When reviewing rulings on hearsay evidence, we review legal questions regarding admissibility for correctness, questions of fact for clear error, and the trial court's final ruling on admissibility for abuse of discretion." *State v. Guzman*, 2018 UT

App 93, ¶ 10, 427 P.3d 401. Additionally, "we will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Gollaher*, 2020 UT App 131, ¶ 21, 474 P.3d 1018 (quotation simplified), *cert. denied*, 481 P.3d 1040 (Utah 2021).

¶24    Miller also seeks remand to the trial court under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence necessary to support another argument that Counsel was ineffective, namely for failing to strike a juror. "A remand under rule 23B will be granted only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Norton*, 2015 UT App 263, ¶ 3, 361 P.3d 719 (quotation simplified).

ANALYSIS

I. Ineffective Assistance of Counsel

¶25    To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified), *cert. denied*, 481 P.3d 1040 (Utah 2021).

¶26    To satisfy the deficient performance prong, the defendant must establish that defense counsel's actions "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To that end, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Indeed, "even if an

omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶27 To satisfy the prejudice prong, the "defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When evaluating prejudice, "an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396 (quotation simplified).

¶28 Miller argues that Counsel was constitutionally ineffective for failing to move for a directed verdict and for failing to highlight during closing argument that, contrary to her trial testimony, Colleen told Nurse that she was wearing jeans at the time of the assault. Relatedly, Miller also moves for remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence to support a third claim of ineffective assistance. We address each argument in turn.

A. Directed Verdict

¶29 Miller argues that Counsel was ineffective for not moving for a directed verdict because insufficient evidence supported his conviction for object rape. He asserts that the evidence was insufficient because Colleen's testimony—which served as the sole basis for his conviction—"was inherently improbable and

relied on, at best, speculation." We hold that Counsel did not perform deficiently in not seeking a directed verdict on these grounds.

¶30 Although appellate courts "are not normally in the business of reassessing or reweighing evidence" and instead generally "resolve conflicts in the evidence in favor of the jury verdict," an exception to this practice arises in "unusual circumstances" "when witness testimony is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). A claim of inherent improbability "is difficult to successfully establish" on appeal. *State v. Cady*, 2018 UT App 8, ¶ 18, 414 P.3d 974, *cert. denied*, 421 P.3d 439 (Utah 2018). In considering whether a witness's testimony is inherently improbable, three factors merit consideration: "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665. But our Supreme Court has warned against an "inflexible reliance on these factors" and has emphasized that "the proper test is, and always has been, whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *Id.* (quotation simplified). In other words, "a sufficiency of the evidence claim, including a showing that testimony cannot support a finding of guilt, is not sustained by merely meeting enumerated criteria considered in a previous case." *Id.* ¶ 36. "Rather, when weighing the testimony in light of the other evidence, the testimony of the witness must run so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* (quotation simplified).

¶31 Miller argues that Colleen's testimony was inherently improbable because she testified at trial that she had fallen asleep on her side while wearing running shorts and that Miller had laid down behind her and reached "up between" her legs to insert his fingers in her vagina. Although Miller concedes that this act

would have been possible if Colleen had been wearing shorts that could be "easily pushed aside" to allow his hand to reach "up between her legs," Miller asserts that Colleen's "allegation simply could not have been accurate" if she had been wearing jeans during the assault[5]—which is what Colleen told Nurse she had been wearing. Thus, quoting *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288, Miller contends that Colleen's "switch at trial to saying she was wearing shorts was 'incredibly dubious.'"[6]

---

5. Although Miller's and the State's arguments accept this factual premise, Colleen actually testified that Miller "partially pulled down" her running shorts *before* reaching "up between" her legs to commit object rape. It is not clear to us that it would have been impossible for Miller to have done the same thing if Colleen was wearing jeans instead of shorts.

6. Miller additionally argues that "[t]here were also discrepancies about [Colleen's] state of mind and awareness." Colleen testified that she took Advil PM in the kitchen with her friends present, yet no one corroborated this claim, and she declined to take a blood or urine test during the sexual assault examination. And although she testified she was "[c]ompletely groggy" when she woke up to Miller's assault on her, at trial she was nonetheless able to recount specific details of the assault and to drive Miller home later that morning. But the fact that no one actually saw Colleen take the pill or that she was able to recall details of the assault despite being groggy during its commission does not render her testimony "so incredibly dubious or inherently improbable that it could not support a conviction." *State v. Jok*, 2021 UT 35, ¶ 31, 493 P.3d 665.

Another alleged inconsistency to which Miller points is that Colleen testified that she tried to push and kick Miller away to no avail when he placed his mouth on her vagina, yet she was able to prevent him from inserting his penis into her vagina merely by

(continued…)

¶32    Miller also points to the lack of evidence corroborating Colleen's allegations of object rape. *See State v. Skinner*, 2020 UT App 3, ¶ 34, 457 P.3d 421 ("Corroborating evidence sufficient to defeat [an inherent improbability] claim does not have to corroborate the witness's account across the board, in every particular. It just has to provide a second source of evidence for at least some of the details of the witness's story."), *cert. denied*, 462 P.3d 805 (Utah 2020); *State v. Rivera*, 2019 UT App 188, ¶ 24, 455 P.3d 112 (stating that the existence of "any additional evidence supporting the verdict would preclude a judge from reconsidering a witness's credibility"), *cert. denied*, 548 P.3d 749 (Utah 2020). He asserts that "[t]he only State witnesses—[Friend 1] and Nurse—offered no corroboration." He says Friend 1 offered no corroboration because she was not present in Colleen's house during the assault, and Nurse offered none because she did not observe any injuries that would correspond with object rape.

¶33    But "the fact that a witness's trial testimony is somewhat at odds with other evidence in the case, including perhaps that witness's own prior statement, is not enough to render that testimony inherently improbable." *State v. Carrell*, 2018 UT App 21, ¶ 53, 414 P.3d 1030 (quotation simplified), *cert. denied*, 425 P.3d 801 (Utah 2018). *See Prater*, 2017 UT 13, ¶ 39 (stating that the inconsistencies between the witnesses' initial statements to police and their trial testimonies "by themselves are insufficient to invoke the inherent improbability exception") (quotation simplified); *id.* ¶ 38 (stating that in *Robbins*, 2009 UT 23, "[i]t was the inconsistencies in the child's testimony *plus* the patently false

---

placing her hand in the way. But this alleged inconsistency relates to charges on which the jury acquitted Miller—not to the object rape charge on which he was convicted—and is therefore immaterial to the object rape charge. *See id.* ¶ 32 (listing "*material* inconsistencies" as a factor meriting consideration when determining whether testimony is inherently improbable) (emphasis added).

statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction") (emphasis in original). This is because "[t]he question of which version of [a witness's story] was more credible is the type of question we routinely require juries to answer." *Id.* ¶ 39.

¶34    Here, when confronted with the inconsistency at trial, Colleen explained that she did not recall telling Nurse that she had worn jeans during the assault but that she had worn "jeans and a T-shirt" to the medical exam. And whether to accept this explanation that the inconsistency was the result of a misunderstanding and the extent to which the inconsistency affected Colleen's credibility were questions that could reasonably be left to the jury.

¶35    For these reasons, the apparent inconsistency between Colleen's two statements regarding whether she was wearing jeans or shorts at the time of the assault, by itself, does not render her trial testimony "inappropriate for consideration in sustaining a finding of guilt." *Jok*, 2021 UT 35, ¶ 36. Counsel therefore did not perform deficiently in not moving for a directed verdict, *see State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 ("The failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance.") (quotation simplified), and this claim of ineffective assistance of counsel fails.

B.    Closing Argument

¶36    Miller next argues that Counsel was ineffective for not discussing during closing argument that Colleen initially told Nurse that she had been wearing jeans—and not running shorts—during the assault. He contends that "the issue of what [Colleen] was wearing was of critical importance" and was "possibly the most important detail of trial" because the object rape that Colleen described at trial—i.e., Miller reaching up between her legs and placing his fingers in her vagina—would have been impossible

had she been wearing jeans. *But see supra* note 5. He further asserts that "[i]n a case where credibility was key, any discrepancy or change in [Colleen's] story would have been important to stress to the jury," especially given the fact that the jury acquitted him of the other two counts with which he had been charged.[7] We disagree.

¶37    "The right to effective assistance extends to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam). However, "[j]udicial review of a defense attorney's summation is . . . highly deferential." *Id.* at 6. *See id.* at 5–6 ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."); *id.* at 8 ("[J]udicious selection of arguments for summation is a core exercise of defense counsel's discretion."). Accordingly, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Id.* But "even if an omission is inadvertent, relief is not automatic" because "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id. See State v. Taylor*, 947 P.2d 681, 689–90 (Utah 1997) ("We are not in a position to review every closing statement . . . to

---

7. We note that "while a split verdict may be consistent with the notion that the jury was conflicted about the evidence or had some doubt about a victim's credibility, it may also just as legitimately suggest compromise or some leniency in favor of" Miller. *State v. Nunes*, 2020 UT App 145, ¶ 33 n.13, 476 P.3d 172 (quotation simplified), *cert. denied*, 485 P.3d 943 (Utah 2021). Of course, in this case, there is an objectively rational basis for the split verdict. The jury could have concluded that the object rape occurred while Colleen was asleep and unable to consent, while the other acts occurred once she was awake, with some evidence suggesting those acts were consensual.

---

determine whether it was persuasive *enough*. . . . An attorney's performance need only be reasonable, and the range of reasonableness is broad.") (emphasis in original) (quotation otherwise simplified). Thus, "[e]ven if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them." *Yarborough*, 540 U.S. at 7. Rather, defense counsel's omission of a particular issue during argument amounts to deficient performance only when the argument is "so clearly more persuasive than those he discussed that [its] omission can only be attributed to a professional error of constitutional magnitude." *Id.* at 9.

¶38    Miller has not satisfied this high burden of demonstrating that Counsel's closing argument was deficient. Counsel's main focus during closing argument was to convince the jury that the sexual encounter between Miller and Colleen was consensual and that Colleen changed her mind only after she saw hickeys on her neck and became afraid that her girlfriend would find out.[8] To establish that Miller's actions were consensual, Counsel made several arguments, including: that Colleen could not have been as groggy as she claimed to be since she seemed to have "a perfect recall of what happened" and because she had the presence of mind to photograph her injuries and to contact her friends immediately following the assault; that Colleen testified that Miller forcefully pinned down both her arms but the pictures she took in the bathroom showed red marks on only one arm—and, curiously, Nurse did not observe marks even on that arm during her examination of Colleen; that Colleen offered to drive Miller home the following morning; and that Miller also had hickeys on his neck, suggesting that Colleen was an active participant in the sexual encounter.

---

8. This argument was not without a sound basis. It might explain why the jury acquitted Miller of two of the three charges. *See supra* note 7.

¶39 Thus, Counsel did not fail to challenge Colleen's credibility in closing argument. Although these challenges were not directly related to the object rape charge, it would not be unreasonable for Counsel to believe that an overall attack on Colleen's credibility would also extend to the believability of her account of object rape. Indeed, reasonable counsel could believe that convincing the jury that the overall encounter was consensual would also extend to how the encounter began and would therefore also result in acquittal on the object rape charge. To that end, Counsel stated during closing argument, with our emphasis, that the hickeys on Miller's neck were "proof positive that [Colleen] was an active and willing participant *in everything that occurred between them*." It was therefore reasonable for Counsel not to give special attention to that specific charge during closing.

¶40 Additionally, we can conceive of at least two strategic reasons why Counsel may have forgone mention of the apparent inconsistency during closing argument. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (stating that in establishing deficient performance, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy") (quotation simplified). First, Counsel may have decided that any alternative argument may have been distracting and taken the jury's focus away from his main argument that the sexual encounter was consensual and that Colleen fabricated the assault allegations only after she realized that the hickeys on her neck rendered the encounter impossible to conceal from her girlfriend. Even assuming that jeans would have rendered the manner in which Colleen described the object rape much less feasible, Counsel may well have determined that discussion of the inconsistency would have muddied the waters, especially since the argument might then have caused the jury to consider Colleen's explanation for the inconsistency and to determine which of the two versions (i.e., jeans or shorts) it found more persuasive. It would have therefore been reasonable for Counsel to decide instead to focus his closing

argument on convincing the jury that the sexual encounter was entirely consensual.

¶41    Second, Counsel may have decided that it was sufficient to expose the inconsistency of what Colleen was wearing during her cross-examination and to avoid mentioning it during closing so as not to invite a rebuttal from the State. *See Pickens v. Gibbons*, 206 F.3d 988, 1001 (10th Cir. 2000) (stating that it was not unreasonable for defense counsel to waive closing argument altogether "in a strategic attempt to preclude the government from offering any rebuttal argument"); *State v. Hoffner*, 811 N.E.2d 48, 57 (Ohio 2004) (same). For example, in rebuttal, the State could have argued that the inconsistency was due to a misunderstanding between Colleen and Nurse during the sexual assault exam. The State might have even pointed out that jeans are an odd choice of sleepwear for one who leaves a gathering with the intention of preparing for bed, thus lending some persuasiveness to Colleen's explanation for the apparent inconsistency. Most importantly, the State could have pointed to the fact that Colleen testified that Miller had partially removed her shorts prior to perpetrating object rape, thus rendering the apparent inconsistency less important. The State could have emphasized that even if Colleen was confused about whether she was wearing shorts or jeans, she correctly recalled that the item of clothing, whatever it was, was partially removed preparatory to commission of the object rape. Counsel therefore might have determined that the defense was best served by bringing the inconsistency to the jury's attention during Colleen's and Nurse's testimonies without providing the State an opportunity to offer a plausible explanation for the inconsistency during its rebuttal in closing argument.

¶42    For these reasons, we conclude that Counsel did not perform deficiently when he omitted from his closing argument any mention of the apparent inconsistency between Colleen's statements regarding whether she was wearing jeans or running shorts at the time of the assault, and this claim of ineffective assistance of counsel fails.

C.    Rule 23B Motion

¶43    Miller also seeks remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with facts to support a third claim of ineffective assistance of counsel, namely, that Counsel was ineffective for failing to request that a seated juror (Juror 15) be removed and replaced by an alternate juror after Counsel was made aware that Juror 15 had a history with Miller and two of his defense witnesses. We first recount the relevant facts and extra-record allegations relevant to this third claim of ineffective assistance.

¶44    During jury selection, Juror 15 introduced himself as "a retired educator here in Logan City School District with a bachelor's degree in art education." After additional prospective juror introductions, the prosecutors then introduced themselves to the jury pool and listed the names of the State's potential witnesses, which included the names of Friend 2 and Friend 3. The trial court then asked the prospective jurors whether any of them were "familiar" with the prosecutors or any of the State's potential witnesses. Three prospective jurors raised their hands, and two of the prospective jurors were dismissed following further questioning by the court.[9] Juror 15 did not raise his hand.

¶45    Counsel next introduced himself, his co-counsel, and Miller and indicated that the potential defense witnesses "are the same as those the State has already mentioned." The court then asked whether any of the prospective jurors were "familiar" with any of those individuals, to which none of the remaining prospective jurors answered in the affirmative. At the conclusion of jury selection, Juror 15 sat as one of the jurors for trial and participated in the jury deliberations that ultimately found Miller

---

9. The third prospective juror also did not ultimately serve on the jury, but the juror was dismissed for an unrelated reason.

guilty of the object rape charge, while acquitting him on two other charges.

¶46 Miller's 23B motion asserts that the post-trial investigation conducted by his appellate counsel revealed "that Juror 15 was a teacher to [him] and several of the witnesses and had substantial and even negative interactions with them." In support of this claim, Miller submitted school records confirming that he, Friend 2, and Friend 3 were indeed students of Juror 15 some ten years earlier, in 2011 and 2012. Miller also submitted an affidavit by his appellate counsel recounting the results of his investigation, as summarized below.

¶47 Friend 3 told appellate counsel that on the second day of trial, he immediately recognized Juror 15 and informed Miller that he was their former middle school art teacher. Miller then asked Counsel to show him the jury list and upon seeing Juror 15's name, he confirmed that Juror 15 was indeed a former teacher of his.[10] Counsel confirmed to appellate counsel that he had been "made aware of this" on the second day of trial, but he did not lodge an objection or otherwise bring this revelation to the trial court's attention.

¶48 Friend 3 also told appellate counsel that in addition to being a former teacher of his, Juror 15 and Friend 3's family had been members of the same church congregation for over 20 years, which fact Friend 3's father also confirmed. Because of this, when he was a student of Juror 15, Friend 3 "made it a point to be a 'brown nose'" "because he knew the juror could go directly to his parents." But Friend 3 also stated that he and some of his friends

---

10. Appellate counsel's affidavit states that during jury selection, no names were used and that prospective jurors were referenced only by their assigned number. Additionally, Miller's father told appellate counsel that based on the courtroom layout and where Juror 15 was seated, Miller did not have a good view of Juror 15 during the first day of trial.

had "terroriz[ed]" Juror 15's house through various means, such as doorbell ditching, toilet-papering his yard, and pouring bleach and pancake batter on his lawn. Appellate counsel's affidavit does not reveal whether Juror 15 ever discovered that Friend 3 was the perpetrator of such acts. Friend 3 also recounted that when he discussed Juror 15 with Friend 2, Friend 2 told him that "Zach is screwed." And when Friend 3 alerted Miller of Juror 15's identity, Miller responded that Juror 15 "did not like him in class."

¶49    Friend 2 told appellate counsel that Juror 15 was "a 'strict' teacher who did not permit 'fun, emotion, joking or screwing around' in class." Friend 2 also recounted that Juror 15 had "kicked him out of class multiple times" and that the last time this had happened, Friend 2's mother became involved and an argument ensued, resulting in Friend 2 never again returning to Juror 15's class.

¶50    The school records that Miller submitted in conjunction with his rule 23B motion indicate that Miller had Juror 15 as a teacher twice for ceramics, in which he obtained grades of B and B+, and once for a drawing and painting class, in which he obtained a grade of P. Friend 3 also had Juror 15 twice for ceramics, in which he obtained A- and B- grades. Lastly, Friend 2 also took ceramics twice from Juror 15 and obtained C and F grades.

¶51    Based on these allegations not found in the record, Miller argues that Counsel "was constitutionally ineffective by failing to ask that Juror 15 be removed." He asserts that such a request would not have resulted in a delay in trial or in a mistrial because an alternate juror was available to sit in Juror 15's stead. He also states that "given the extensive history that [he] and two of the three defense witnesses had with this one juror, the court almost certainly would have had no choice but to remove the juror." Accordingly, he seeks remand under rule 23B to supplement the record with evidence to support this claim of ineffective assistance.

¶52  "Rule 23B of the Utah Rules of Appellate Procedure provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel where the inadequacy of the record on appeal is a result of the ineffective assistance alleged." *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719 (quotation simplified). We will grant an appellant's motion for remand under rule 23B only upon satisfaction of the following requirements: "(1) [the motion] must be supported by affidavits alleging facts outside the existing record, (2) the alleged facts must be non-speculative, and (3) the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim, i.e., counsel's deficient performance and resulting prejudice." *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926. We hold that Miller has not satisfied the third requirement.

¶53  A criminal defendant has the right under both the Utah and federal constitutions to a trial by an unbiased, impartial jury. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]"); Utah Const. art. I, § 12 ("In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury[.]"). In determining whether defense counsel performed deficiently in jury selection or retention, "counsel is given an especially wide berth." *State v. Marquina*, 2018 UT App 219, ¶ 37 & n.10, 437 P.3d 628, *aff'd*, 2020 UT 66, 478 P.3d 37. *See Marquina*, 2020 UT 66, ¶ 44. This is because jury selection and retention are "more art than science." *State v. Litherland*, 2000 UT 76, ¶ 21, 12 P.3d 92.

> There are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about jurors. A juror's demeanor, interaction with others in the courtroom, and personality in general may all play an important role in providing clues as to that juror's likely predilections toward the case at hand.

*Marquina*, 2020 UT 66, ¶ 43 (quotation simplified). And "by the end of trial, counsel will have had even more time to observe jurors and determine their likely predilections toward the case." *Marquina*, 2018 UT App 219, ¶ 37 n.10 (quotation simplified). For this reason, defense counsel's decision in jury selection or retention "may even appear counterintuitive, particularly when viewed from the perspective of a bare transcript on appeal." *Litherland*, 2000 UT 76, ¶ 22. Accordingly, "counsel's lack of objection to, or failure to remove, a particular juror is presumed to be the product of a conscious choice or preference," *Marquina*, 2020 UT 66, ¶ 44 (quotation simplified), and "the decision not to remove a particular juror need only be plausibly justifiable, and such plausible justifiability is ordinarily presumed," *Litherland*, 2000 UT 76, ¶ 25.

¶54    A defendant may rebut this presumption by showing

> (1) that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justifiable.

*Id*. Here, Miller argues that Counsel's "failure to do anything in the face of learning Juror 15 knew [him] and two of the three defense witnesses, constituted either inattentiveness or 'other specific evidence,'" thereby implicating the first and third possible rebuttals of the presumption.

¶55    Concerning the third rebuttal, Miller asserts that this was "a case that hinged on credibility determinations," and "it was known during trial that [he] did not think the juror liked him and

that the juror had numerous negative interactions with at least one of the defense witnesses."[11] But appellate counsel's affidavit states only that Counsel was "made aware" on the second day of trial that "Miller and two of his witnesses recognized and had a history with" Juror 15. The remaining information the affidavit recounts was expressly the result of appellate counsel's post-trial investigation, including that Juror 15 was a former middle school teacher of Miller, Friend 2, and Friend 3; Miller's comment to Friend 3 that Juror 15 "did not like him in class"; Friend 2's comment to Friend 3 that "Zach is screwed"; the fact that Friend 3's family and Juror 15 had been in the same church congregation for over 20 years; and Friend 2's negative experience in Juror 15's class. Thus, contrary to Miller's assertions on appeal, it is not clear from the affidavit whether Counsel was actually informed of the negative view Miller, Friend 2, and Friend 3 had of Juror 15 or vice versa.

¶56 Furthermore, even if Counsel had been made aware of the information appellate counsel's investigation revealed, this is not sufficient to establish that Counsel's decision not to seek Juror 15's removal was not "plausibly justifiable." *Id.* It is plausible that Counsel might not have been concerned by the fact that Juror 15

---

11. Alternatively, Miller argues that "the presumption of reasonableness to counsel's performance cannot apply" in this case because "the facts needed to support any presumption of reasonableness in jury selection are absent here when [C]ounsel failed to take steps needed to make an informed choice." But our Supreme Court has repeatedly stated that "counsel's lack of objection to, or failure to remove, a particular juror is presumed to be the product of a conscious choice or preference," *State v. Marquina*, 2020 UT 66, ¶ 44, 478 P.3d 37 (quoting *State v. Litherland*, 2000 UT 76, ¶ 20, 12 P.3d 92), and has clarified a means by which this presumption may be rebutted, *see Litherland*, 2000 UT 76, ¶ 25. The Court has not suggested that the presumption is subject to prerequisites. For this reason, this argument necessarily fails.

did not like Miller as a student and frequently expelled Friend 2 from his class some ten years earlier or that Juror 15 attended the same church congregation as Friend 3's family.[12] Indeed, "an attorney may make a reasoned judgment that a prospective juror's consciousness of, and concern for, his or her own potential bias actually provides a more sure foundation for confidence in that juror's reasoning processes." *Id.* ¶ 22. "The attorney may even sense that the prospective juror is likely to overcompensate by assigning more weight or credibility to testimony that tends to oppose the juror's own potential bias." *Id.* (quotation simplified). A reasonable attorney could have made a similar judgment in this case.

¶57 Concerning the first rebuttal, i.e., Miller's assertion that Counsel was inattentive, a "defendant must either prove a specific and clear example of inattentiveness that directly caused the failure to object to a particular juror, or else show that counsel generally failed to participate in a meaningful way in the process as a whole," to rebut the presumption on that ground. *Id.* ¶ 25 n.10. Because Miller has not engaged with this requirement, he has not carried his burden of persuasion and we do not address that issue further. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903.

¶58 For these reasons, the additional facts Miller alleges are insufficient to establish the deficient performance prong of his ineffective-assistance claim, and we therefore deny his motion for remand under rule 23B of the Utah Rules of Appellate Procedure.

---

12. The affidavit does not state that Juror 15 ever discovered that Friend 3 "terroriz[ed]" his house. To the contrary, Friend 3's statement that he was a "brown nose" in Juror 15's class because he knew Juror 15 "could go directly to his parents" suggests that Juror 15 would have notified Friend 3's parents if he had discovered that Friend 3 was one of the perpetrators.

## II. Rule 803(4)

¶59   Hearsay is a "statement" that "the declarant does not make while testifying at the current trial or hearing" and is offered by a party "to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c)(1), (2). Hearsay statements are inadmissible at trial unless authorized by rule or law. *See id.* R. 802. Rule 803(4) of the Utah Rules of Evidence is one such rule that excepts from the general bar on hearsay a statement that (1) "is made for—and is reasonably pertinent to—medical diagnosis or treatment" and (2) "describes medical history; past or present symptoms or sensations; their inception; or their general cause." "If the statement meets both of rule 803(4)'s qualifications, it is admissible because of the patient's strong motivation to be truthful when discussing his or her medical condition with a doctor." *State v. Guzman*, 2018 UT App 93, ¶ 28, 427 P.3d 401 (quotation simplified).

¶60   Miller argues that the trial court erred in admitting Nurse's hearsay testimony regarding the verbal history and the answers to the standardized questions she obtained from Colleen during the sexual assault examination. He asserts that the court incorrectly concluded that the challenged testimony was admissible under rule 803(4) "because the majority of the statements were not necessary for medical treatment." Specifically, Miller asserts that the following portions of Nurse's testimony relating to the object rape charge[13] did not fall under the ambit of rule 803(4):

- Colleen "said she had friends over for a get-together, and there had been some alcohol."

---

13. Miller also points to several of Nurse's statements that related to the other two charges on which he was ultimately acquitted. We have no need to recount those statements here.

- Colleen "was not feeling well, took an Advil PM, and went to bed."

- Colleen "woke up lying in bed 'with [Miller] behind her.'"

- Miller was, "in her words, 'fingering her.'"

- Colleen "didn't know what to do at the time. She kind of sat there for a moment."

- Colleen "stated that she said no, and it continued."

- Colleen "said the perpetrator was 'Zach Miller,' who was an 'acquaintance.'"

¶61 Miller contends that "Nurse learned nothing from the testimony noted above that made any difference in her diagnosis or aided in the treatment"—to the contrary, he contends, "Nurse did not render a diagnosis and did not treat [Colleen], other than to ask her standardized questions and perform a standardized examination." And in any event, he argues, "[a]ll the information Nurse needed to treat [Colleen] occurred when [Colleen] said she had been sexually assaulted" and "[t]o any extent more is permitted, the level of detail Nurse testified to far exceeded any conceivable medical treatment purpose in this case."[14] In support

---

14. Miller additionally argues that even if the challenged statements were admissible under rule 803(4), they were nonetheless inadmissible because "they had no relevance to the decision the jury was being asked to make." Specifically, he contends the statements did not make "it more or less probable that [Colleen] did not consent" to the sexual encounter and that they were duplicative of Colleen's testimony. *See* Utah R. Evid. 401; *id.* R. 402. But Counsel did not object to Nurse's testimony on relevance grounds, and this argument is therefore unpreserved.

(continued…)

Miller contends that, to the extent the argument is unpreserved, Counsel was ineffective for not objecting to the challenged statements as irrelevant. Concerning the deficient performance prong, he asserts that "[i]t would have been unreasonable not to also object on relevance grounds, as [C]ounsel should have been aware both that evidence no matter any other rule must still be relevant to be admissible and given the facts of this case Nurse's testimony contributed nothing of relevance to the decisions the jury had to make," i.e., whether the sexual encounter was consensual. But "[f]ailure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. And here, despite Miller's assertions to the contrary, the challenged statements did go directly toward consent as well as to other elements of the charged crimes. Namely, Colleen told Nurse that she went to sleep after consuming alcohol and taking Advil PM and woke up to Miller committing object rape on her. She told Miller "no," but Miller continued. Thus, the statements tended to make the fact of lack of consent more probable, *see* Utah R. Evid. 401(a), and any objection Counsel would have made as to relevancy would have been futile.

Concerning Miller's assertion that the challenged statements were irrelevant because they were duplicative of Colleen's testimony, rule 401 does not exclude repetitive evidence from its definition of relevant evidence. *See id.* R. 401. In support of this argument, Miller cites caselaw concerning the admissibility of prior consistent statements under a separate rule of evidence, *see State v. Nunes*, 2020 UT App 145, ¶ 25, 476 P.3d 172 (considering admission under rule 801(d)(1)(B)), *cert. denied*, 485 P.3d 943 (Utah 2021), which has no bearing on whether evidence is relevant under rule 401 of the Utah Rules of Evidence.

Finally, quoting *State v. Fedorowicz*, 2002 UT 67, ¶ 24, 52 P.3d 1194, Miller argues that "[t]he court here failed in its gatekeeping function to 'scrupulously examine' the testimony before it was

(continued…)

of this argument, Miller cites the advisory committee note to rule 803(4) of the Federal Rules of Evidence, which gives the example that although "a patient's statement that he was struck by an automobile would qualify" as a statement made for medical diagnosis or treatment under rule 803(4), "his statement that the car was driven through a red light" would not qualify. *See* Fed. R. Evid. 803(4) advisory committee's note.[15]

¶62   But Counsel objected to Nurse's testimony only once, and the objection was broader than what Miller now argues on appeal.

---

admitted." But *Fedorowicz* specifically discussed a court's duty to "scrupulously examine" evidence of other crimes, wrongs, or bad acts before exercising its discretion to admit such evidence under rule 404(b) of the Utah Rules of Evidence—it imposed no such duty in the context of rule 401. *Id.* (quotation simplified). To the contrary, "a trial court is not required to constantly survey or second-guess a nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." *See State v. Guzman*, 2018 UT App 93, ¶ 39, 427 P.3d 401 (quotation simplified). Indeed, "the court should take measures to avoid interfering with potential legal strategy or creating an impression of a lack of neutrality." *Id.* (quotation simplified).

15. Because Utah's rule 803(4) "is the federal rule verbatim," *see* Utah R. Evid. 803 advisory committee's note, we may "look to federal cases interpreting the federal rule for guidance," *State v. Vallejo*, 2019 UT 38, ¶ 76 n.14, 449 P.3d 39. *Cf. Supernova Media, Inc. v. Pia Anderson Dorius Reynard & Moss, LLC*, 2013 UT 7, ¶ 40 n.8, 297 P.3d 599 ("Interpretations of the Federal Rules of Civil Procedure are persuasive where . . . the Utah Rules of Civil Procedure are substantially similar to the federal rules.") (quotation simplified). Federal advisory committee notes are not necessarily on the same footing, but Miller's reliance on them is not unreasonable.

After the State asked Nurse to "[t]ell us about" the verbal history she obtained from Colleen during the examination, Counsel objected on hearsay grounds. The State countered that the testimony was being offered pursuant to rule 803(4), to which Counsel responded that Colleen's answers were "not for medical history per se" and, instead, the purpose of Nurse's questions was "to report to law enforcement." Thus, the trial court was faced with a general objection to Nurse's testimony regarding the verbal history she obtained from Colleen, and not to any specific statement to which Nurse testified thereafter. For this reason, our review is limited to evaluating Counsel's general, macro-level hearsay objection at the onset of Nurse's testimony that the trial court overruled—and not the unpreserved challenges to individual statements Nurse subsequently made that Miller now raises on appeal.[16]

¶63 As a general matter, "courts have proven hesitant to exclude statements that serve a medical purpose even if they also serve an investigative one." 30B Charles Alan Wright et al., Federal Practice and Procedure § 6845 (Apr. 2023 update). Indeed, "Utah courts have repeatedly held that statements by rape victims made to medical providers describing their abuse are admissible under rule 803(4)." *State v. Nunes*, 2020 UT App 145, ¶ 25 n.10, 476 P.3d 172. For example, in *State v. Guzman*, 2018 UT App 93, 427 P.3d 401, this court held that a rape victim's statement to a nurse that she was raped four times was admissible under rule 803(4) because the victim made the statement "for purposes of medical treatment or diagnosis, and the statements allowed the nurse to

_____

16. Miller has not argued that Counsel was ineffective for failing to lodge additional objections to Nurse's testimony regarding specific statements contained within the verbal history or the standardized questionnaire, nor has he argued that the trial court clearly erred in not sua sponte foreclosing the testimony he now challenges on appeal.

address the possibility of injuries, pregnancy, and sexually transmitted diseases." *Id.* ¶ 32.

¶64 Similarly, in *State v. Burnside*, 2016 UT App 224, 387 P.3d 570, a sexual assault nurse examiner testified regarding a child's statement that the appellant "had done . . . bad touches" to her. *See id.* ¶ 9 (quotation simplified). The trial court held that the nurse's testimony qualified for admission under rule 803(4). *See id.* ¶¶ 40–41. On appeal, the appellant argued that the court plainly erred because "the nurse practitioner was acting as a de facto law enforcement officer and not a medical health professional." *Id.* ¶ 40 (quotation simplified). This court affirmed the trial court's finding that "the nurse practitioner was acting as a health-care professional and that Child's statements to her fell within the medical treatment hearsay exception." *Id.* ¶ 43. *See id.* ¶ 41 (discussing the nurse's testimony that, among other things, "the questions asked by the nurse practitioner were to determine whether Child displayed symptoms of having been sexually abused and to determine if she required medical treatment") (quotation simplified).

¶65 Here, Nurse testified that as a sexual assault nurse examiner, she received specialized training in, among other things, "injury documentation, how to perform a forensic exam, [and] how to care for the patient that has been sexually assaulted." Regarding treatment, she stated that sexual assault nurse examiners "will offer some recommendations for the patient in regards to medications to prevent sexually transmitted infections as well as medication to prevent pregnancy, and [they] also recommend some follow-up care for them in regards to counseling, mental health, and any follow-up for injuries that we may have found with a medical provider." And following her examination of Colleen, Nurse recommended, and Colleen obtained, "medications for sexually transmitted infection prevention, and pregnancy prevention."

¶66 As discussed above, when Counsel objected to Nurse's testimony regarding her examination of Colleen, he was objecting to the entirety of the testimony she was about to offer. But while Nurse's examination certainly did serve a law enforcement purpose, it likewise served a medical purpose of identifying and treating any injuries Colleen might have sustained. Thus, Nurse's testimony regarding any statements Colleen might have made during the examination were also "reasonably pertinent to . . . medical diagnosis or treatment." Utah R. Evid. 803(4)(A). *See* 30B Charles Alan Wright et al., Federal Practice and Procedure § 6845 (Apr. 2023 update) ("[T]he proffered statement does not need to be necessary to treatment, only reasonably related to that purpose."); *United States v. Iron Thunder*, 714 F.2d 765, 772 (8th Cir. 1983) ("Even though [the doctor's] examination and questioning of [the rape victim] were pursuant to a standardized protocol designed in large measure to prepare for criminal prosecution, Rule 803(4) applies to statements made for the purpose of medical diagnosis as well as to statements made for the purpose of medical treatment."). Although it is entirely possible that specific statements Colleen made to Nurse during the examination did not satisfy rule 803(4), it was incumbent on Counsel to object to those individual statements.

¶67 For these reasons, when faced with a wholesale objection to Nurse's testimony regarding what Colleen told her during the sexual assault examination, the trial court correctly rejected Counsel's argument that Nurse's testimony could not satisfy rule 803(4) because the examination also served a law enforcement purpose.

## CONCLUSION

¶68 We reject Miller's claims that Counsel was ineffective for not moving for a directed verdict or for omitting discussion in his closing argument of the apparent inconsistency concerning whether Colleen wore jeans or running shorts at the time of the

assault. We likewise deny Miller's motion for remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence supporting his third claim of ineffective assistance concerning Juror 15. Finally, we conclude that the trial court did not err in admitting Nurse's testimony under rule 803(4) of the Utah Rules of Evidence.

¶69   Affirmed.

———————